UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

        - against -

MARK P. KAISER,

                  Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

04 Cr. 733 (TPG)

**OPINION**

      Mark Kaiser moves under Fed. R. Crim. P. 33(a) for a new trial on the ground that the Government improperly withheld exculpatory and impeachment materials in violation of Brady v. Maryland, 373 U.S. 83 (1963). His motion turns on evidence he says he obtained in May 2009 well after his 2006 trial. Kaiser claims that this evidence came to light in connection with a Securities and Exchange Commission administrative proceeding against two individuals who audited Kaiser's former company, U.S. Food Services ("USF"). Kaiser contends that the Government was aware of these materials at the time of Kaiser's trial (thus violating Brady) and their introduction at this trial would have resulted in an acquittal. Kaiser requests an evidentiary hearing on his motion.

      The motion is denied. The court believes that an evidentiary hearing is not warranted.

1

**BACKGROUND**

A: The Facts

USF purchased food and related products from vendors and distributed these products to a variety of customers, including restaurants, healthcare facilities, hotels, and schools. Royal Ahold, N.V. ("Ahold"), a Netherlands-based foodservice conglomerate, acquired USF in April 2000.

Kaiser was Executive Vice President of Purchasing, Marketing, and Procurement at USF until becoming USF's Chief Marketing Officer in February 2001. Kaiser's responsibilities included purchasing, marketing, and generally maintaining relationships with USF's vendors. In addition, Kaiser oversaw the auditing of USF's financial statements, which entailed working with independent auditors who conducted quarterly reviews of USF's financial information. Under USF's executive compensation system, Kaiser would earn large bonuses if the company met or exceeded its earnings targets.

Many of USF's vendors participated in the company's "promotional allowance" program, whereby USF earned rebates from its vendors based on the volume of goods USF purchased. These promotional allowances, or "PAs", were provided for in written contracts and recorded as income on USF's financial statements.

The evidence showed that Kaiser knew that USF's operating performance was in decline and had fallen below expectations.

Consequently, in order to meet budgeted earnings targets, he inflated artificially the company's income by falsifying PA-related income. Kaiser accomplished this by reporting income arising from PAs that had not been earned and encouraging vendors to confirm inflated PA-related receivable balances. Kaiser also employed accounting adjustments to make it appear that USF was meeting earnings targets despite decreasing sales. And he made misrepresentations to USF's outside auditors to the effect that there were written contracts underlying PAs and prepayments from vendors. Rather, the contracts that did exist contained provisions that, if carried out, would have limited the recognition of money from vendors as income on USF's books. So Kaiser secured the cooperation of vendors by creating phony confirmation letters for vendors to provide to the auditors that supported his inflated PA figures while giving the vendors side letters that said that the amounts in the confirmation letters were not truly owed. The result was that the operating income for 2001 and 2002 for USF and Ahold was overstated by a total of $700 million.

B: Procedural History

1) Pre-Trial

On March 16, 2006, Kaiser was indicted on one count of conspiracy to commit securities fraud and to make false SEC filings and falsify books and records (18 U.S.C. § 371), one count of securities fraud

3

(15 U.S.C. §§ 78ff), and four counts of causing false filings to be made with the SEC (15 U.S.C. §§ 78ff).

2) Trial

Trial commenced on October 12, 2006 and concluded on November 8, 2006. The Government presented testimony from 11 witnesses: Tim Lee, Executive Vice President of Purchasing & Procurement at USF; Bill Carter, Vice President of Procurement at USF; David Rowland, who worked in accounting at USF; executives from vendors with which USF conducted business, including one Gordon Redgate; and personnel from Deloitte & Touche, who served as USF's and Ahold's independent auditors after April 2000.[1] In addition, the Government introduced documents from USF's records, including confirmation letters and reports to auditors containing information about USF's practices concerning PAs, which were shown to be substantially false.

The jury convicted Kaiser of all counts in the indictment.

3) Post-Trial

On December 5, 2006, Kaiser moved for a judgment notwithstanding the verdict under Fed. R. Crim. P. 29(c) or, in the alternative, for a new trial under Fed. R. Crim. P. 33; the court denied the motion on February 15, 2007 after a hearing. The court then sentenced Kaiser on May 17, 2007 to a term of 84 months imprisonment. On May 31, 2007, Kaiser filed a notice of appeal. Kaiser is currently

---

[1] KPMG LLP served as USF's auditors before Ahold acquired USF in April 2000.

4

released on bail pending resolution of his appeal, which was argued before the Second Circuit on July 6, 2009.

C: The SEC's Administrative Action against USF's Former Auditors, Kevin Hall & Rosemary Meyer of KPMG

On February 16, 2008, the SEC initiated an administrative action against Kevin Hall and Rosemary Meyer,[2] the lead auditors from KPMG who audited USF's financial statements prior to the Ahold acquisition in April 2000. The SEC alleged that Hall and Meyer "engaged in improper professional conduct in the audit and review of the financial statements of USF" for having failed to scrutinize adequately certain cash receipts from vendors to USF. A hearing was held before Administrative Law Judge Carol Fox Foelak from July 9-20, 2007 and on October 5, 2007. The administrative action ultimately was dismissed on January 15, 2008 based on a determination that Hall and Meyer did not engage in the conduct charged by the SEC. The SEC's Division of Enforcement appealed the case, and the decision is currently under review.

D: Kaiser's Present Motion for a New Trial

On May 28, 2009, an unknown third party informed Kaiser of evidence the Government allegedly withheld from Kaiser at the time of his trial. This evidence involved matters related to the SEC proceeding against Hall and Meyer. Kaiser then submitted a letter to the Government detailing this newly discovered evidence on June 23, 2009

---

[2] In the Matter of Kevin Hall and Rosemary Meyer, Administrative Proceeding File No. 3-12208, filed February 16, 2006.

5

and subsequently met with the Government on June 26, 2009. After reviewing the materials, the Government notified Kaiser that it would not respond to Kaiser's letter and instead would oppose the motion it anticipated Kaiser filing under Fed. R. Crim. P. 33(a). On June 30, 2009, Kaiser moved for a new trial, which included a request for an evidentiary hearing, and also submitted a supplemental memorandum on August 24, 2009. The Government opposed on October 21, 2009, and Kaiser filed his reply on December 11, 2009.

**DISCUSSION**

Motion for a New Trial

Rule 33 permits a court, upon defendant's motion, to vacate a judgment and order a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Relief is justified under Rule 33 if the defendant makes a showing that the evidence is in fact 'new' . . . and that the evidence is so material and non-cumulative that its admission would probably lead to an acquittal." United States v. Siddiqi, 959 F.2d 1167, 1173 (2d Cir. 1992). But the "standard for granting such a motion is strict," United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995), and the "ultimate test is whether letting a guilty verdict stand would be a manifest injustice . . . There must be a real concern that an innocent person may have been convicted." United States v. Canova, 412 F.3d 331, 349 (2d Cir. 2005).

6

The Brady Rule

Brady v. Maryland, 373 U.S. 83 (1963), imposes a general duty on the Government to produce all information in its possession that is favorable to the defendant and material to the issue of guilt. This obligation also extends to information that could be used to impeach prosecution witnesses. Giglio v. United States, 405 U.S. 150, 153-54 (1972). To prevail on a Brady claim after trial, a defendant must demonstrate a reasonable probability that the outcome would have been different if the materials at issue had been available to the defendant. Strickler v. Greene, 527 U.S. 263, 280 (1999).

A prosecutor is presumed to have knowledge of all information gathered in connection with his office's investigation of the case and indeed has a duty to learn of any favorable evidence known to others acting on the Government's behalf in the case. United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998). Accordingly, the prosecution must disclose documents material to the defense that (1) it has actually reviewed, or (2) are in the possession, custody, or control of a Government agency so closely aligned with the prosecution so as to be considered in the hands of the "prosecution team." See United States v. Chalmers, 410 F. Supp. 2d 278, 290 (S.D.N.Y. 2006). The Second Circuit, however, has declined to impute to prosecutors knowledge of documents prepared by persons employed by another arm of the Government who were "uninvolved in the investigation or trial," United

7

States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993), because that would require the adoption of a "monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis." Avellino, 136 F.3d at 255; see also United States v. Upton, 856 F. Supp. 727, 750 (E.D.N.Y. 1994) (refusing to order prosecution to disclose documents in possession of other agencies because no joint investigation existed).

Items of Alleged Newly Discovered Brady Materials

The information the Government allegedly withheld from Kaiser includes: (1) an e-mail database; (2) work papers of KPMG related to the 1998 audit of USF; (3) a file of former USF employee David Rowland; (4) an audit paper prepared by Deloitte; (5) certain statements by KPMG auditors Kevin Hall and Rosemary Meyer; and (6) a decision by the SEC not to offer proof in its administrative proceeding against Hall and Meyer regarding an $18.5 million prepayment by Puritan Chemical to USF when proof of the transaction was offered at Kaiser's trial. Kaiser's claims as to each of these items will now be discussed.

1) The E-mail Database

Kaiser claims that the Government never produced a database containing approximately 50 gigabytes of e-mails—including e-mails involving prosecution witnesses—that the SEC produced to Hall and Meyer shortly before their administrative hearing. Specifically, Kaiser cites an e-mail from USF's former General Counsel David Abramson to

8

show that he was knowledgeable about a prepayment from vendor Puritan Chemical in July 1999. Kaiser claims that this evidence substantially undercuts Abramson's testimony about a threat to report to the SEC Kaiser's booking of the prepayment to income, which the Government emphasized on summation was a "powerful" indication that Kaiser knew that what he was doing was wrong.

It appears, however, that the Government provided Kaiser with the contents of this database two years before trial. In fact, Kaiser's counsel acknowledged receipt of the database on September 14, 2006. As such, the database does not constitute newly discovered evidence and cannot serve as the basis for granting a new trial.

More importantly, it is unclear how introduction of this evidence would have altered the outcome of the case. This is pre-Ahold acquisition evidence that the court determined was relevant only as background of the conspiracy and as proof of knowledge and intent. Moreover, there was ample other evidence—testimony from Lee and Redgate, the Puritan agreement, checks from Redgate to USF, and other USF documents showing how these checks were treated—that established plainly that Kaiser booked prepayments from vendors improperly to income. Evidence undercutting Abramson's threat therefore would not have undermined the verdict.

2) The 1998 KPMG Audit Papers

Kaiser contends that KPMG's audit work papers from 1998 contain evidence that the auditors were actually shown the vendor contracts and other information about prepayments of the kind that the Government claimed were concealed. Specifically, Kaiser points to language in the 1998 KPMG Audit Papers stating that the auditors reviewed partnership vendor agreements between certain vendors and USF.

The SEC had these work papers in connection with its administrative proceeding against Hall and Meyer and indeed had them prior to the time of the trial of the criminal case against Kaiser.

Kaiser charges the prosecutors in Kaiser's criminal case with constructive knowledge of these documents because the SEC "assisted" in investigating and trying the case by designating a special AUSA, Alex Lipman, to participate in the trial, thus extending the Government's Brady obligation at least to the 1998 KPMG work papers. The court agrees with the latter point.

As already described, Kaiser asserts that the 1998 KPMG Audit Papers contain exculpatory information demonstrating that Kaiser provided the auditors with the information allegedly concealed. Indeed, the 1998 work papers state that for certain vendors, the auditors "reviewed partnership vendor agreement (vendor and UFS)," and "met with Kaiser to discuss promotional allowances, review promotional

10

contracts, and walkthrough Mr. Kaiser's revenue, billing, and unbilled calculations for the vendors denoted."

But the 1999 KPMG work papers, which Kaiser had in his possession before trial, contain substantially the same recitals as the 1998 work papers. Yet, Kaiser did not seek to introduce or otherwise use the 1999 KPMG work papers at trial.

In any event, Kaiser's argument that the 1998 KPMG Audit Papers are exculpatory is unavailing. In the first place, it is concealment from the Deloitte auditors that was charged in the criminal case against Kaiser. The evidence is overwhelming that Kaiser concealed information relating to PA programs and prepayments from them. As far as the KPMG auditors, Hall and Meyer, no one called them as witnesses at the criminal trial. And despite what was said in their work papers, they testified in the SEC proceeding that they only reviewed term sheets and were never shown any actual vendor contracts that had a reference to or condition concerning prepayments or any future purchase commitments. And no copies of vendor contracts are included with the work papers nor are they quoted.

3) The Rowland Audit File

Kaiser maintains that documents from the file of USF accounting employee David Rowland ("the Rowland Audit File") provide information that would have allowed him to prove that two of the Government's witnesses—Rowland and Lee—played greater roles in USF's audit process

11

than they conveyed at trial and that at least one purportedly incriminating phone call of Kaiser's with Gordon Redgate to obtain fictitious vendor confirmations did not occur. First, Kaiser claims that the Rowland Audit File demonstrates that Rowland, far from being "an unwitting dupe that Kaiser manipulated," had substantive responsibility for USF's responses to KPMG regarding booking of prepayments and confirmation of vendor receivable balances. And the Rowland Audit File ostensibly reveals that Lee, rather than Kaiser, was the source of information that KPMG relied upon in clearing up the discrepancies it registered during the 1999 audit. Second, the contents of the Rowland Audit File allegedly raise questions about the timing of a call with Redgate to secure false vendor confirmations. Based on the July 30, 1999 date on a schedule of vendor confirmations, Kaiser was away on vacation when the call supposedly occurred, information which could have been used to impeach Redgate. Taken together, Kaiser argues that the Rowland Audit File undermines the Government's theory that Kaiser masterminded the PA-inflation scheme and exclusively was responsible for the audit process.

The Government asserts that neither it nor the SEC at any point has been in possession of the Rowland Audit File and, consequently, no disclosure obligation under Brady was triggered. In fact, the Government only learned of its existence through Kaiser in June 2009.

Notwithstanding this lack of knowledge, the contents of the Rowland Audit File are not inconsistent with the evidence adduced at trial. Rowland worked at USF in the accounting department from 1993 through 2000 and again from September 2001 until July 2003. The bulk of Rowland's testimony concerning the audit process, however, related to his second stint at USF when he served as "promotional allowance account manager." With respect to Lee's involvement, the Rowland Audit File confirms his testimony that his role in connection with the audit process was principally to deal with vendors and obtain information from them, which he then passed on to Kaiser. Lee was limited to interacting with vendors, not the auditors, a fact corroborated by Hall and Meyer during their SEC administrative proceeding. In fact, Hall and Meyer not only failed to indicate that they met with Lee at any point, but they also identified Kaiser as the sole USF representative with whom they met and reviewed PA receivable balances.

And as for Kaiser's call with Redgate, the Government argues that the Rowland Audit File in no way contradicts Redgate's testimony concerning the timing of a call he had with Kaiser about fraudulent confirmation letters. Rather, consistent with Rowland's testimony regarding the process by which false letters were obtained, any call with Redgate to receive assurances that such letters would be forthcoming had to occur prior to the date listed on the schedule of vendors, July 30, 1999, or before Kaiser left for vacation.

13

Since both the Government and the SEC were wholly unaware of the existence of the Rowland Audit File until Kaiser brought it to the Government's attention, the Government cannot be charged with intentional suppression under Brady. But even assuming that the file should have been produced and that it establishes, as Kaiser contends, that Rowland and Lee played larger roles in the audit process than their trial testimony suggested, this would not diminish Kaiser's culpability. Greater involvement by Rowland and Lee and potential additional impeachment evidence of Redgate, a cooperating witness who was subject to substantial and thorough cross-examination, do not make a material difference. The extensive testimonial and documentary evidence of Kaiser's fraudulent conduct and stewardship of the PA-inflation scheme would not have been overcome by the Rowland Audit File.

4) Ahold Accounting Memo #1 Prepared by Deloitte

Kaiser further believes that a new trial is warranted in light of his discovery of a Deloitte work paper concerning USF's 2003 audit ("Ahold Accounting Memo #1"). This memo documents Ahold's PA-accounting policies for the fiscal years 2000 through 2002. Kaiser urges that this memo shows that Deloitte disagreed with a "substantial" number of adjustments that Ahold's forensic auditor, PricewaterhouseCoopers ("PwC"), had identified as fraudulent and which led to Ahold's May 8, 2003 announcement of the financial impact of the overstatement of PAs at USF. Kaiser claims that this document therefore demonstrates that

14

Deloitte allowed wider latitude in accounting for prepayments than the Government argued at trial and that the impact of the alleged fraud was overblown.

The Government states that, as a threshold matter, it did not possess Ahold Accounting Memo #1 at the time of trial, and in line with its argument above, it cannot be charged with constructive knowledge of the document simply because the SEC had it. Nevertheless, the discrepancies between PwC's restatement figures and Deloitte's are minimal because under either analysis, at least 95% of the reported accounts receivable was determined to be fraudulent, confirming the material impact of Kaiser's conduct on Ahold's financial statements. Ahold Accounting Memo #1 would not have contributed materially to the defense.

        5) Hall and Meyer's Statements to the Government Regarding Vendor Contracts

Central to its case, the Government posited that Kaiser led a scheme to conceal vendor contracts and prepayments from USF's auditors. Kaiser contends that contrary to the evidence shown at trial, KPMG auditors Hall and Meyer informed the Government and the SEC in interviews in 2003 that they in fact had seen written vendor contracts during their audits of USF. Kaiser complains that the Government failed to produce notes or any other records of these interviews.

The Government states in its brief that at no time did the KPMG auditors tell the Government during interviews prior to trial that Kaiser

15

showed them written contracts with vendors providing for prepayments, so that there was no exculpatory material to disclose to Kaiser. The Government, however, has not supplied an actual affidavit or declaration supporting this statement. But there really is no likelihood that there is a substantial difference between Hall and Meyer's interviews and their testimony at the SEC administrative proceeding as to having viewed only term sheets and not the underlying vendor contracts themselves, because had Hall and Meyer acknowledged reviewing the actual vendor contracts in their interviews, surely the SEC would have introduced this information during the administrative proceeding to impeach their credibility. Kaiser's only basis for his speculative belief that this testimony was contradicted by prior testimony is a statement offered by an SEC lawyer during the appeal of the Administrative Law Judge's decision in the Hall and Meyer administrative proceeding. There is nothing in the argument about the Hall and Meyer interviews that offers anything materially exculpatory.

6) The SEC's Decision Regarding The Puritan Transaction

At trial, the Government presented ample evidence of Kaiser's effort to structure an $18.5 million prepayment from vendor Puritan Chemical in a way to avoid detection by KPMG. Kaiser arranged for Puritan to pay Redgate's company, Private Brands, instead of USF, instructed Redgate to break the $18.5 million up into smaller checks to conceal the large

16

payment from the auditors, and caused USF improperly to recognize the entire amount as income for the fiscal year 1999.

Kaiser argues that the SEC's decision to exclude evidence of this $18.5 million prepayment from Puritan from its administrative proceeding against Hall and Meyer indicates that the prepayment in fact was properly booked to income. Kaiser opines that since this evidence would have strengthened the SEC's case considerably, the only plausible explanation for not including it is that the prepayment was accounted for correctly. But what the SEC decided to do about the evidence in its administrative proceeding does not rebut the actual evidence admitted at the criminal trial on this point.

## CONCLUSION

For the foregoing reasons, the court concludes that the Government did not violate its obligations under Brady v. Maryland as alleged by Kaiser. Particularly, Kaiser has not demonstrated that the alleged items of evidence, either individually or together, would have resulted in an acquittal. The court believes on the basis of the present record that no evidentiary hearing is required.

Dated: New York, New York
January 11, 2010

SO ORDERED

*/s/ Thomas P. Griesa*

Thomas P. Griesa
U.S.D.J.